Would you call the next case? Play Beverages v. Playboy Enterprises International Okay, when counsels are going to argue, no matter, please step forward to the podium. If you would state your names for the record and the party you're representing. Good morning, Your Honor. I am Todd Jacobs. I'm here on behalf of the appellants, Play Beverages, LLC and Sertran Beverage Corporation. Good morning. Pete Ross. Not the same Mr. Ross who left the pool, but on behalf of Playboy Enterprises responded. Fifteen minutes, please. Yes. Time for rebuttal? Five minutes. Five minutes? Okay. All right. Thank you. We'll proceed then. Good morning. May it please the Court again, I'm Todd Jacobs on behalf of the appellants. I'm going to call the appellants Playbov just because the two clients' names are a bit of a mouthful if I don't do that. The Court knows from the briefs that the case below was a complicated commercial dispute involving the rights to the Playboy name and the rabbit ear logo for an energy drink that was called Playboy Energy Drink. And there was a license agreement in 2006. There were competing claims between the parties for breach of contract, silly conspiracy, tortuous interference, trademark infringement, trademark dilution, counterfeiting, big commercial case went to trial for almost four weeks. This appeal is much more cabined than that. I'm happy to answer any questions about the merits of what the dispute was about, but the appeal here today really focuses on two days of what happened at that trial. When I believe it was October 20th, the jury had just gone out to deliberate, and at the very end of the day, three of the jurors, three of the 12, 25% of the jury, went to the court clerk and said the following. We'd like to find a secret way out of the courthouse because we're scared of the men in the gallery. That's what they said. That's all we know about it because there was never any follow-up questioning of the jurors. There was never any further vordeal. There wasn't a post-trial hearing with evidence on what these jurors were talking about. And as I've come to, this is what we asked for. We think there is a fundamental procedural right to have that sort of vordeal to figure out whether the jury was fair and impartial. So I should take a step back. I just have a factual question. Yes. These gentlemen that were in the courtroom, were they there throughout the entire proceeding? Do we know? They were in and out. They were definitely there during the closings. It was close to a four-week trial. I can't tell you if they were there every day. They were there a lot of the days. We had local counsel in the case. I didn't try the case, but I was over there occasionally and saw these gentlemen sitting there. There's no dispute that the jury knew that these men in the gallery were associated with my clients. They were investors and friends of my clients. So the jury came back and asked the court clerk for the information that I just gave you, and we don't know what happened. We don't know what happened. So what I want to do today, just briefly, because I think this has been laid out in the briefs pretty well, is just give you an idea of what the substantive law is, what the procedural law is, what happened and what should have happened, just kind of that quickly. Substantive law, I believe it's undisputed. I would be surprised if it was disputed that there's a right to afford an impartial jury under the Due Process Clause of the Fifth and the Fourteenth Amendment of the United States Constitution, as well as the Illinois Constitution, Article I, Section 2, applies in civil cases, applies in criminal cases.  I also don't think it's really in dispute what sort of procedural safeguards there are to guard that substantive right. So if you look at the cases in our brief, going back to the 50s, at least 1954, with the United States Supreme Court decision in Rameau, followed up by Smith v. Phillips, we cited a number of Illinois cases on the point as well, one of which I want to draw your attention to in particular, the McGee v. City of Chicago case, I think is the closest on point to what we have here and the legal principles are controlling. I'll come back to that. So this comes out in the evening of the 20th. On the 21st, Judge Mitchell, who is the trial court judge, alerted the parties to this. There was an extended discussion about it. The judge decided to read a curative instruction to the jury. Planov, my client, objected in part to that instruction. It was read to the jury. The jury is still deliberating. Lunch hour comes. Planov thinks about what the judge said. 25% of the jury is scared of the men in the gallery who are associated with our client. Okay? The men in the gallery are not in the court record anywhere. They're not witnesses. They're not evidence. They're wholly a part of what the jury should be deciding a case based on. It should be record evidence. It should be the exhibits. It should be testimony. The men in the gallery are not any of that. They're totally at strangeness for the process. But for some reason, which we don't know the answer to, 25% of the jury is scared of the men in the gallery. The law is pretty clear that if there is some sort of indicia of a problem with the jury, and it's amazing if you read all these cases from voir dire, through the trial, through deliberations, through post work, the number of ways jury trials can go awry with jurors doing things. It's kind of amazing to watch. But there is a constant thread through the cases that if there is an indicia of a problem with the jury, that they're not fair and impartial in some way, that you should get to the bottom of what's happening. You should get to the bottom of what's happening. Are we not to consider what stage this trial was at? I mean, the delicate balance once the jury starts to deliberate. I take the court's point. I think particularly if you look at McGee versus City of Chicago, People versus Green and People versus Williams, what the case law says is yes, you do need to take that into account. But it's such a fundamental right to have a fair trial in front of an impartial jury, to take just really the few minutes that this would have taken to figure out what these jurors were concerned about. All that would have had to have been done was to take them and say, you expressed a concern about the men in the gallery and you were scared of them. What's the basis for that? What are you talking about? This didn't have to be a three or four hour process or a two day process. And that's what the cases say. The cases say you've got to take the time, even though we understand the trial judge doesn't want to inconvenience the jury or make them think they're accused of something. It's really not an inconvenience. It's the court not wanting to step in to the deliberations. I mean, by the time this issue was more specifically raised, they were in the end of their second day of deliberations. Well, I think they had gone out precise maybe an hour or so on the first day. And then that's when they told the court. So it wasn't really that far into the deliberations. But even the rule on when you can inquire of a jury post-verdict, which is not what we have here because there hadn't been a verdict yet. But Illinois Rule of Evidence 606B says that you can't, even if there had been a verdict, you can inquire of the jurors if there was extraneous information that got to the jurors somehow, or if the jurors had been outside influence. And was that done here? No. Did you do it post? I mean, didn't the trial judge say, do you look at the concerns? What I have before me is some concerns about getting a secure exit. So the first solution he had, and everybody seemed to agree with it, he had a little objection to what the instruction was to say, hey, let's get you, we'll make sure you get taken out by the private elevator. And it was done in kind of a neutral way. And so that was done. And then later when he brought this up, he says, hey, you can take care of this at the other end if you still have concerns. Okay, so I think that what happened is undisputed, and I think this probably goes to Playboy's waiver argument as well. The exact objection was made at trial. If you look at our appendix, pages 75 to 91, we specifically asked the trial court judge to void the jurors, to see if there was bias. This is when you came back. Okay, that's when you come back with the mistrial motion. Okay, the court denied that based on Rule 606B, which I think the rule doesn't apply because it wasn't post-verdict to begin with. But even if it, I think the rule is kind of instructive in the, even though it doesn't apply, it's instructive in the situations where this kind of voir dire should be allowed. Extraneous information or, in the words of the statute, outside influence being brought to bear on the jurors. We don't know. I think Playboy says in their brief they don't know. We certainly don't know because the voir dire never took place. But those are the two instances provided by the statute where this sort of inquiry is allowed. Okay, so that's what happened during the trial. Judge denied it. Jurors came back later that afternoon with the verdict. Judge excused them at that point and told them, and this is in the record at, I believe, just to make sure you've got this, 3677-78. He told the jurors, you can talk to Playboy's counsel, but you're not required to. Okay, you're not required to. And that's exactly what happened. Playboy's counsel tried to talk to the jurors. None of the jurors would talk to them. Unsurprising to me that none of the jurors would talk to them when they're not under any legal compulsion to do so. This is then brought up again in the post-trial motions. Exact same argument is made by Playboy, but just so you have it for the record, since there is a waiver argument being made here. This is discussed in some detail at 3111-3131. There were 30 pages about why the jurors should have been foregeared. So Jackson was made at trial, tried to talk to the jurors, raised in the post-trial motions, didn't get anywhere. We don't know what the jurors were thinking. The jurors were pulled there at the end, right, when they rendered their verdict? They did. They had a unanimous verdict. And did any issue come up during the polling on the jury? No. It had been denied. So I would urge you to look at McGee v. City of Chicago because it mirrors this case in a couple of ways. So what happened in McGee, one of the jurors was doing independent research on memory lapse, which was an issue in the trial. The court found out about it, didn't foregear the jurors, but gave the jurors a curative instruction a lot like the one we have here, a lot like the one we have here, where it says you should decide the case based on the evidence. Okay, that happened. Over the weekend, here we've got, in our case, we've got a delay of bringing a missed trial motion of about an hour and a half because it was brought over the lunch hour. In McGee v. City of Chicago, the whole weekend goes by. Come back, and then the defendant, I believe it was the defendant, made a missed trial motion and said they wanted to foregear the jury, and the trial court wouldn't allow them to. Parties there argued waiver, just like Playboy did here. The trial court said, no, that's not a waiver. It was time to raise the fact that there was an instruction earlier, it's not the end of the game because the jury had not come back with a verdict yet. And like the McGee case, if you look at Playboy's waiver argument, the trial judge actually decided this on the merits both at the trial and in the post-trial motion. So I don't know how you could have a waiver issue, a legitimate waiver issue, when it's actually been decided on the merits on the post-trial motion and at trial. So there's a couple of cases that have some language in them that make me think exactly of this case. So we're sitting here saying, look, you know, Mr. Hawatme, who's the principal of Playboy, Ehab Hawatme, foreign-sounding name, you know, came to the U.S. in 1984. He's a darker-skinned individual. The men in the gallery are darker-skinned individuals. We know what's going on in politics. We're looking at this whole thing and wondering, why is the jury scared of our client? We're looking at this thinking, this is really potentially a big problem. But we don't know for sure. And so Playboy says, what does Playboy say about this? You're speculating. Well, in a sense, I think they're right that we are speculating because our right to vordeer the jurors, the fundamental procedural right to vordeer these jurors to find out what actually happened, was denied. We were the only party, I think, that got this right. We asked to vordeer the jurors. Playboy objected. Trial judge wouldn't let us do it. And so this is what two of the cases say about this, both of which reversed situations where jurors were not allowed to be vordeered. The issue was allowed to hang in the balance on conjecture when inquiry couldn't resolve the issue. That is exactly this case. We're never going to know what these jurors were scared of with respect to the men in the gallery. But we know 25% of the jury was scared of them. And those men are associated with our clients hours before a verdict is rendered. And it's unfortunate that this happened at the end of a trial, but we can't control that. We were the ones who got it right. And if you're going to err in any direction in a case like this, when you're looking at substantive rights under the 5th and the 14th Amendment in the Illinois Constitution, you have got to err on the side of protecting a right to a fair and impartial jury trial. And you see that in the cases. I mean, the cases say, geez, we really don't want to do this. We really don't want to have to reverse this and send these cases back for a new trial. It's a lot of resources. It's a lot of inefficiency. But this is just too important not to have gotten it right. And so in a way, it's a big, complicated commercial dispute. But I think it's actually a pretty simple issue on appeal. And the cases say that's reverse and amend. Playboy, you know, spent 60 pages of their brief saying what a great case they have. And I'll tell you, they're very fine words. I saw them in court. They did a great job. They tried a great case. But the harmless error rule doesn't apply here. Not when you have rights to a fair and impartial jury. They've got to have the greatest case in the world. But if this jury was potentially partial and our procedural rights were disregarded, it does not matter how great a case they have. And I could give you 20 minutes on the Playboy side of this for why the jury should have done something different. But I don't really think it's important for what we're doing here today. Thank you. Thank you. Once again, Pete Ross for Playboy. This is an interesting area of the law, a developing area of the law. And I think this court could do something to help clarify this area of the law. As I see these cases, there is a bright line standard emerging among them. Each case relied upon by the appellants is readily distinguished by a critical circumstance. In each case, there was clear, objective evidence of juror misconduct, actual juror misconduct. McGee v. City of Chicago, a juror had done independent research into a critical issue in the case, memory lapse. People v. Green and People v. Mitchell. During Verdeer, the jurors in issue had said they had never been victims of crime. In People v. Green, the statements were contrary to the jurors' own juror questionnaires. In Mitchell, outside records showed that the juror in issue had been the victim of a burglary. So in each case, a juror had apparently failed to respond truthfully or accurately to questions during Verdeer. Apparent juror misconduct. And in each case, the appellate court held, this court, that an inquiry was warranted under those circumstances. You know, I understand the other side's argument that we don't know exactly why they were afraid. But, you know, like I said, that delicate balance in the trial court has been alerted to something. But if they start questioning it, are they going to overemphasize some concerns that really weren't, at that point, weren't playing a part, but then become a part because the court's not playing a spot? Well, I think that's a real danger here. We had a very experienced, wonderful trial judge, Judge Mitchell, and he was dealing with that. I wouldn't disagree, but, you know. He was dealing with that balance himself by actually pulling people out of the deliberations and start questioning them. They could have given credence to a theory that there was something nefarious going on or something they should have been afraid of. But even the de la Pena case, the U.S. Supreme Court case, follows this bright-line standard of juror misconduct. In de la Pena, the defense submitted sworn affidavits of two jurors that a juror had stated that he voted to convict the defendant, and I quote, because he was Hispanic. Misconduct. And under those circumstances, the U.S. Supreme Court held that inquiry was warranted. And I'm going to quote from the case where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus. A clear statement. To convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule of Federal Rule of Evidence 606B give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee. In the present case, there is zero evidence of any juror misconduct. These jurors said they were, quote, scared of the men in the gallery, close quote. But even that quote comes from, it's almost like third-level hearsay, isn't it? It is. It's like what the judge reported, that the clerk reported, that the jurors reported. Right. So there's zero evidence of misconduct by these jurors. It's not misconduct to be afraid. In the words of Della Pena, there's no clear statement that a juror relied on racial stereotypes. Unlike the jurors in McGee or Green or Mitchell, the jurors did not fail to give accurate answers during Verdeer. They did nothing wrong. There's zero evidence they did anything wrong. There is not a single case holding that a judge must stop deliberations to question jurors who did nothing wrong. If it were the court to decide or side with the defense here, it would be going where no court has ever gone before, timing. And Justice Rochford, I can't see that far. I guess so. The fact that, Justice Rochford, you've asked about this, the fact that the incident occurred during deliberations makes a big difference. The deliberative process is sacrosanct. We always talk to jurors during Verdeer. We're free to talk to jurors after they've rendered their verdict. But we don't talk to them during their deliberations. The deliberative process is where we don't want to invade their reasoning or go behind it. And appellants here have not cited a single case where a judge was held to be in error for not interrupting the deliberations. So two bright-line standards. No cases ever held that jurors who were not engaged in apparent misconduct had to be questioned. And no case has ever held that we stop the deliberations to question the jurors then and there. Never happened. I want to go back and talk a little bit about the circumstances of the case and what really happened here. The trial court was in the best position to judge what happened. And it concluded, and I quote, Plaintiff's complaints about ethnic bias are invented, close quote. Invented. Strong language. But I want to put that very apt conclusion into perspective. Ehab Hawane is not dark-skinned. He dresses entirely in Western dress. He speaks without an accent. And during the entirety of the trial, no one mentioned his ethnicity, country of origin, or religion. I wouldn't have known, based on his name alone, what part of the world he came from. And the three jurors who complained said nothing about him. Nothing at all about Ehab Hawane. Nothing about ethnicity. Nothing about accents. The three jurors said they were scared of the men in the gallery. Justice Reyes, you were asking about that, and there were in fact a number of men in the gallery. The four pictured in the opening brief were not the only ones there. Nor were they there every day. Nor were they there when the jurors complained. No one was there when the jurors complained. And in fact, we don't really know who the jurors were complaining of. But that seems to me, I don't know if you've raised that part in your Applebee's brief, that it seemed to be everyone sort of agreed with that. No, we do not agree. And it is in that brief that we don't know who they were complaining of. There is no consensus on that. All they said was the men in the gallery. But whoever... I haven't looked at the book. Counselor Erner mentioned that it was clear that they were associated with their client. That's true, that those four men who were pictured were associated with their client. Why? Because twice during the trial, Playbell's lawyer referenced the gallery and said, our investors are here watching. And so there's some connection to this vague reference to the gallery. But whoever, whoever they were referring to, it is highly doubtful that the dark skin color would have played any role because two of the three complaining jurors were African American. And I'm sure they weren't holding grudges against people because of a dark skin color. Further, with respect to the four men pictured in the opening brief, during the trial, they didn't have captions over their heads saying what their names were or their countries of origin. No one knew their names. No one knew their countries of origin. They dressed in Western dress. They did not have beards, common in Muslim countries where they're cut square. No one heard whether they spoke with accents or not. They could have been from Sicily, Greece, Romania, Brazil, or right here in Chicago. There was not the slightest hint that any of them were Muslim. I still don't know if any of them are Muslim. I happen to know that Ehab Hawadmeh is not Muslim because I tried a previous case against him and he testified under oath there that he was a Coptic Christian. So that means his brother, who's one of the four men pictured, is a Coptic Christian. There's one with an Armenian name. Most Armenians in this country are Christian because they fled from their native land after the Armenian Holocaust. And if we think about that for a moment, apparents are accusing jurors of potentially anti-Muslim bias when no one on the jury, or sitting in this courtroom today, knows whether anyone involved is actually a Muslim. In addition, during the entirety of this three-week trial, no one mentioned the ethnicity, religion, background of any witness. No one raised an objection on a nativist theory. It was a business case, tried on the merits as a business case, with contracts, financial statements, expert witnesses. No one even mentioned ethnic bias or a nativist theory after the three jurors complained. The first time the words ethnic bias were used was in a post-trial motion. And yet the defense now faults the trial judge for not halting jury deliberations to ask about a theory that had never been raised at that point in the trial. The entire appeal comes down to three points. Anti-Muslim sentiment was in the news. We repeatedly referred to Mr. Horatne by his real name. And some men in the gallery had dark skin. It's no wonder that the trial judge who sat there for nearly a month of a business case being tried on the merits said this nativist case theory is invented. And one last point I wanted to mention was this. Last week there was a case decided by the Second Circuit, United States v. Baker. And it's a 218 Westlaw 3747345. I'm sorry, what was it? 3-7-4-7-3-4-5. Excuse me, did you provide that to counsel previously? I think we told them yesterday. We didn't. Okay. We did not. It was decided August 8th. And it follows up on De La Pena, which is why I mention it. We probably shouldn't go into it. Okay. I will mention it further then. Thank you very much. Thank you. Thank you. May it please the Court, just a couple of quick things. First, counsel said there's two bright-line standards here that we'd be violating in setting new press, and I don't agree with either one of them. First up, said the McGee case and Mitchell v. Green all involved objective evidence of germ misconduct. Well, the Court can read those cases. You'll see the Court affirmatively didn't say that there had been any germ misconduct. The question was whether there had been any germ misconduct, given that voir dire had not been allowed. So there wasn't any objective evidence. There was some indicia of a problem, just like there's indicia of a problem here. I have to tell you, it's overt to me anyway. It's very concerning that four in 25 percent of the jury goes to the court's clerk. That's no small thing, to go to the court's clerk to say you're scared of the men in the gallery who are associated with one of the parties. If that in and of itself is not objective evidence of a problem, I don't know what is. He said there's no cases or jury deliberations. To the contrary, 606B allows us to inquire even after a verdict under the circumstances that we have here, where there's potential outside influence or potential information outside the record. We have both of those here. 606B expressly allows the inquiry under those circumstances. So there is no bright-line rule to the court. How would you respond to the fact that the trial judge's comment with regards to the ethnic bias, it's obvious that the trial court did not just flippantly make that comment, but it appears that it was after due consideration of what was argued by both sides to the trial court. The invented? Yes. First of all, I would urge the clerk to read the 75 to 91. It's kind of a key thing. So the judge said it was invented. I think Judge Mitch is a great trial judge, too, and I think sometimes even great trial judges make mistakes. There's no way anyone would know today or back then almost two years ago, I don't know now as I'm standing here at the podium, what these jurors were worried about. I don't know if it was because of Muslim dislike. I don't know if it was because of Middle Eastern dislike. Maybe the jurors thought our client was from Peru and didn't like Peruvians. That's not permissible either. But you didn't give Judge Mitchell a chance to address that at the time you made the moral motion to. I respectfully disagree with the exact quote from trial counsel. Trials are fast-moving things, so it's not easy to be perfect. But counsel said we want to ordeal the jurors to see if there is impermissible bias. Okay, so they didn't say Middle Eastern, they didn't say Muslim. But bias is pretty good. I mean, on the fly to get that. And I don't think, given what the jurors said to the clerk, and given Ehab Haratmo and what people look like and how this case was tried, that there was any doubt when he was mine what Playdough was talking about with respect to bias. But I also don't think Middle Eastern Muslim bias does it. I mean, if it's some sort of impermissible bias, even if it's not those, we're entitled to know it. And the problem is we don't know it because the procedure wasn't followed. And so we're all sitting here today wondering, or as the cases say, conjecturing about what was going on, and we shouldn't have to do that. I mean, that's the fundamental thing to me. Actually, we're not accusing the jurors of anything, even today. We don't need to prove actual bias today. We're just trying to figure out what the heck happened. And that right was denied. It's all the cases that Playboy cites, and we didn't put in a declaration, you know, you didn't prove actual bias.  We couldn't possibly prove that unless we allowed a Judge Mitchell, who reviews the jury, to find out what actually happened. And as the cases said, this is a very small price to pay in terms of time to make sure litigants get a constitutionally required impartial jury trial. Thank you. Thank you. All right. I want to thank counsels for a well-argued letter. I'm just going to take another advisement, and as I mentioned earlier, our colleague Justice Hall will be reviewing the tapes and joining in on the decision. Thank you.